# EXHIBIT B

State Court of Fulton County
***EFILED***
File & ServeXpress
Transaction ID: 53613255
Date: Aug 09 2013 01:17PM
Cicely Barber, Clerk
Civil Division

**Omar M. Lattouf, MD PhD, FACC, FACS**
Professor of Surgery/Cardiothoracic, Emory University School of Medicine
Faculty Director of the Cardio Metabolic Syndrome Education Program,
The Halle Institute for Global Learning of Emory University
6th Floor Medical Office Tower
550 Peachtree Street NE
Atlanta, Georgia 30308
Phones: Office 1-404-686-2513; Cell 1-404-550-2076
Email: olattou@emory.edu, olattouf@gmail.com
November 16, 2012

James W. Wagner, President
Emory University
408 Administration Building
201 Dowman Drive
Atlanta, Georgia 30322

Vinod H. Thourani, MD
550 Peachtree Street
Emory University Hospital Downtown
Medical Office Tower, 6th Floor
Cardiothoracic Surgery
Atlanta, Georgia 30308

Ajit P. Yoganathan, Phd.
Georgia Tech's and Emory's Department
of Biomedical Engineering
313 Ferst Drive, Suite 2119
Atlanta, Georgia 30332-0535

Georgia Tech Research Corporation
Attention; Holmes Hawkins,
1180 Peachtree Street
King & Spalding
Atlanta, Georgia 30332-0416

Georgia Tech Foundation
Attention: Mark W. Long, Secretary
760 Spring Street, 4th Floor
Atlanta, Georgia 30308

Re: Plagiarism, Coordinated False
Statements, Conspiracy for Fraud and
Conversion, Dishonesty by Faculty and
Senior Staff of Emory and Georgia Tech.
Perfidious misuse of testing facilities for
public benefit; Breach of Assignment of
Intellectual Property, and Unfair
Competition.

Gentlemen:

Index:

Roles Germane to this Letter/Duty to Report        pages 2-5

Focus of this Letter                               page  5

Press Releases/Public Statements                   pages 5-11

Exhibit G1

000002

| Georgia Tech/Venture Labs | pages 11-15 |
| Georgia Tech/Emory/Venture Labs | pages 15-18 |
| Emory | pages 18-22 |
| Background/Trusted Advisors | pages 22-25 |
| Unknowns/Preservation of Evidence/Demands | pages 25-27 |

## Roles Germane to this Letter/Duty to Report:

As you know, I am a practicing heart surgeon on the faculty of Emory University, and am a major shareholder, and on the scientific advisory board, of Trans Cardiac Therapeutics, Inc. (herein "TCT"), which seeks to invent, develop, own and commercialize, all over the world, advances in medicine and medical procedures and equipment; and the holder of several patents and considerable confidential and proprietary information. This letter is written on behalf of me as inventor and for the benefit of TCT.

You, Dr. Ajit P. Yoganathan, are a member of the faculty of Georgia Tech and Emory University in biomedical engineering, and were, from 2005, a consultant and a member of the Scientific Advisory Board for my company, TCT.[1] In January of 2008, you executed a Scientific Advisory Board Agreement which included confidentiality and non-disclosure agreement.[2] You have willingly contributed, as work for hire ($10,000 "donation" to your designated affiliate of your employer/provider of facilities) and consultant (with opportunity for stock options), your advice and counsel to my company and my efforts to make advances in medical equipment, and received in confidence and as an agent/advisor confidential and proprietary information and knowledge of my intellectual property, patent pending inventions and patented inventions. And, as you represented to me when I expressed concern, you, were a member of the biomedical engineering joint department between Emory and Georgia Tech and that you are covered by the Master Agreement of Emory to respect my and TCT's intellectual property (and I verified that you gave lectures at Emory and had students at Emory and your official business card identifies you as a holder of joint academic position at Emory University and Georgia Institute of Technology).

You, Georgia Tech Research Corporation (herein "GTRC"), in tandem with Dr. Yoganathan, agreed to my confidential tests of my confidential and proprietary ideas and

---

[1] See Ex. B-1 Agenda of Nov. 7, 2005 meeting with Board identified (redacted)

[2] See Ex. B-2. After roughly three (3) years of work for hire and consultancy in which you learned of my proprietary information, you disclosed your consultancy with others, and specifically emailed your desire to discuss one clause, which you penned in: "Please note I consult with other companies, big and small, who work in the heart valve repair and replacement fields." And you orally assured me that TCT's and my intellectual property would be protected and kept confidential and not shared with others.

000003

information on the Georgia Tech Mechanical Heart Model. As a integral part thereof, and in response to my request for terms of service, I was required to "donate" $10,000 from my Emory Discretionary Fund to the Georgia Tech related entity designated by you (GTRC), which was Georgia Tech Foundation, for utilization of your labs and personnel for the tests related to a chord connected to the apex of the heart (and mitral regurgitation and various effects).[3] You, Dr. Yoganathan and GTRC, were well advised and aware of the confidential and propriety nature of the information and tests divulged by me (Dr. Lattouf) to you, and agreed to keep all confidential and respect my intellectual property.[4] A written non-disclosure agreement was requested for the protection of TCT's information (as was routine for all exposed to TCT's technology), but not forthrightly or timely presented and not executed (as recently discovered). Only the form of draft prepared by Georgia Tech licensing associate Heather Graham (disclosed from metadata on forms), dated February of 2005, was received (more than three and a half years later, with obscure method of transmission and deception in substance), which discloses (and excludes) only the "Annuloplasty Chain" developed by Dr. Yoganathan and Mr. Jimenez, et al, and disclosed as an invention by him and Mr. Jorge Jimenez to Georgia Tech.[5] That invention of the "Annuloplasty Chain" was the sole oral disclosure also. In addition to the agreement for confidentiality and the work/rental for compensation, I understood that the internal protocols at Georgia Tech call for the confidentiality of any intellectual property disclosed in connection with the performance of testing services utilizing Georgia Tech facilities.[6] I also understood at the time that Emory and Georgia Tech had a joint Department of Biomedical Engineering and the fact that I had an Emory Release Agreement, in accordance with its terms and other non disclosure agreements existed at the time with Emory University, that such provides me effective non-disclosure agreement with the "joint Biomedical Engineering Department of Emory/Georgia Tech". You, Georgia Tech Foundation, are the designated recipient of the $10,000 required for my use of GTRC's testing facilities and personnel, and as such, are a part of the platform for fraud and deceit (recounted herein) of your related Georgia Tech entity which includes facilities intended for the benefit of the public, to the best of my understanding.

You, Dr. Vinod Thourani, are a member of the Faculty of Emory University and a medical colleague introduced by me to Dr. Yoganathan and Mr. Jiminez and in confidence I taught you the transapical access for the purpose of conducting intra cardiac repair on the mitral valve and other intra cardiac defects, and you were advised of my company TransCardiac Therapeutics Inc., and its interest and my interest in developing and owning and commercializing for profit advances in medicine, including matters that I had patented and confidential information that I possessed in furtherance of that area; and you orally agreed to

[3] See Ex. A-1 for my email asking for terms; See Ex. A-2 for my record of payment of $10,000
[4] Discussed infra in "Background", pp. 17-20, with reference to forms at Ex. F-1 and F-2.
[5] Id.
[6] "uncompromising integrity" in research:  http://www.grc.gatech.edu/research-administration/  :
University System of Georgia Code of Conduct: "We will: …VII Respect the intellectual property rights of others."    …11. "Disclose and avoid improper conflicts of interest.  http://www.usg.edu/audit/compliance/ethics/

contribute your advice and counsel to my company and my efforts and keep confidential the information I shared with you. You have been a member of TCT's Scientific Advisory Board since 2005.[7] You, Dr. Thourani, are also bound by the Master Agreement with Emory University which prohibits you from appropriating Intellectual Property disclosed to the University by one of its own faculty. My inventions were shared in confidence with the Emory faculty of Cardiac Surgeons (including Dr. Thourani and Dr. Thomas Vassiliades) in January of 2005 at the Cardiac surgeon retreat.

You, Emory University, are my alma mater and my employer. As with all employees/affiliates with Emory, including "research collaborators", Emory retains expressly proprietary ownership of intellectual property, unless released and assigned. My inventions and patent application were disclosed to Emory, and Emory executed releases and assignments, including the first one dated September 25, 2002, and later ones of February 17, 2005, and May 7, 2009.[8]

Note: As should be apparent, notwithstanding anything herein, all words and/or statements in this letter related to wrongful or unlawful or actionable conduct relate to "civil" wrongs, and not any criminal sense related to such same words. However, I do not disagree with the following:

"Plagiarism" defined: "the appropriation of another person's ideas, processes, results or words without giving appropriate credit."   42 C.F.R. 93.103

"Research Misconduct" defined: "fabrication, falsification or plagiarism …in reporting research results."   Id.

All statements herein are made: 1) in *good faith* and 2) in accordance with *my legal and moral duty* to TCT and the multiple investors therein, and to protect and redress the damage to my interest therein and in the inventions/confidential information herein described,  and 3) in accordance with Emory Policy 7.20 which requires employees to operate in accordance with all laws and regulations and ethical principles and to report suspected violations; and 4) generally the Emory policy to report research misconduct or regulation/policy violations, including, without limitation, Policy 7.8; and 5) existent policies consistent herewith, including the reported Agreement between Emory and Georgia Tech which agrees on confidentiality, non-disclosure and respect for intellectual property (consistent with the principles of each institution). However, such good faith reports are for the benefit of Emory and Georgia Tech, and none of the

---

[7] On Board for years of 2005-2009 per your recent online CV, but no notice was received of leaving the board in 2009, and per your online CV (just discovered), you were on scientific advisory board of Mitral Solutions for 2007-2009, which was a competitor and no notice was received of that conflict and service for a competitor. [Notably the CEO of this competitor becomes the CEO of Apica, the company you surreptitiously founded.]

[8] See Ex. C-1, C-2, and C-3. (redacted).

reports herein abrogate my right and duty to seek full redress for, including full damages, caused by of all violations of laws of the State of Georgia or the United States, as provided by law.

## The Focus of This Presentation: Breaches of Integrity

The focus of this presentation is coordinated false statements in press releases, articles and websites, plus misappropriation, plagiarism, fraud and conversion of confidential and proprietary information, including by work for hire and consultants and employer/university under contract of assignment of inventions. As background, my provisional patent application of December, 2001, depicted and labeled apical access port "Transmural Valved Gateway". The second sentence of the Abstract of the subsequent patent: "One procedure involves providing a valved passageway through the patient's left ventricular wall at the apex of the patient's heart and advancing instruments through the valved passageway...." All drawings and illustrations show the passageway at the apex of the heart. In the Summary of the Invention: "The valve may be permanently or temporarily within the heart wall passageway." In the registration records of the European Commission this first patent is titled the "Apical Instrument Port" with a priority date of December 8, 2001.

Quotes regarding the significance of the invention from Leaders in Cardiac Surgery: James L. Cox, M.D., (renowned national leader and innovator in cardiac surgery) 12/12/03 (after signing confidentiality): "very impressed"...."novel concept"..." To my knowledge, this is the first description of a method for gaining ventricular access to the atrioventricular valves that you have described."...."I am convinced it will work." From the Strategic Plan for Emory Cardiothoracic Surgery, February 2005: "Dr. Omar Lattouf has started a spin off corporation to develop a novel method of trans-apical mitral valve repair. Cardiac surgeons MUST have time available to participate in those efforts. Surgeons clinically fully engaged are not going to be able to make contributions in innovation."

This presentation in letter format will reveal how all of you began a course to arrogate my technology in a creeping and growing fashion until it became a complete, brazen false claim, publicly disseminated. Emory's Office of Technology Transfer (OTT), through its Director Dr. Todd Sherer, adopted dishonest and unlawful goals and acted to negate my assignment rights and aid and abet their arrogation and destruction. Dr. Yoganathan, Mr. Jimenez and Dr. Thourani worked in tandem with Georgia Tech research labs and Emory OTT to accomplish this goal. Neither Emory's Office of Technology Transfer ("OTT"), nor Georgia Tech's research labs have been operated responsibly or with integrity. The evidence demonstrates willful and intentional deception and planned arrogation of intellectual property.

## False Statements and Press Releases----Coordinated.

Recently discovered press releases, incident to a new company founded by Drs. Yoganathan and Thourani and a Georgia Tech employee (Mr. Jimenez) et al called Apica

Cardiovascular Technologies, Inc., disclose their intent to commercialize alleged new inventions by them and allegedly supported by transfer of technology from Emory (which I have not seen and per my understanding cannot properly include my inventions) and from Georgia Tech (which I have not seen) and describe and emphasize as their most valuable feature the precise same procedure for opening and closing the heart wall that is covered by my confidentially disclosed intellectual property, patent applications and patents and my research and focus of interest, including confidential information. Apica's public statements have been in tandem with press releases from Emory and Georgia Tech issued in support of Apica's public statements and in purported validation of the alleged proprietary inventions and the claim of Apica thereto.  In our state, aiding and abetting tortuous conduct is unlawful.

A potpourri of these press releases and other relevant descriptions of Apica and its technology (from Emory, Georgia Tech and Apica or its backers) are as follows:

"a technology that simplifies and standardizes the technique for opening and closing the beating heart during surgery." ["to advance the goal of minimally invasive cardiac surgery."]  [The company aims] "to develop the system, which will make the transapical access and closure procedure required for delivering therapeutic devices to the heart more routine for cardiac surgeons.  The goal is to expand the use of surgery techniques that are less invasive and do not require stopping the heart."[9]

"Apica Cardiovascular has licensed the Georgia Tech/Emory technology, and ...."  ..."Our company has leveraged the expertise in cardiovascular technology at Georgia Tech and the clinical experience of surgeons at Emory University to develop a technology that has the potential to revolutionize the delivery of different types of medical devices to the heart, including aortic and mitral valves," said the company's CEO James Greene."[10]

"The improved heart surgery system consists of a conduit with proprietary technology inside that allows the conduit to be securely attached to the beating heart.

---

[9] http://www.coe.gatech.edu/content/georgia-tech-research-good-heart   Also:
http://innovate.gatech.edu/healthcare/georgia-tech-emory-university-startup-apica-cardiovascular-receives-51-million-investment-improved-heart-surgery-system/  Also:
http://www.gatech.edu/newsroom/release.html?nid=64186  Also: www.eurekalert.org/pub_releases/2011-02/giot-acr020911.php

[10] http://gtresearchnews.gatech.edu/apica-cardiovascular/  Also:
http://biosciencetechnology.com/News/Feeds/2011/02/disease-research-apica-cardiovascular-receives-51-million-investme/  Also: id http://gatech.edu/newsroom/release.html?nid=64186 Also: id
http://tribes.gatech.edu/hg_news/64186  Also: Id (www.innovate.gatech.edu) shown above; Also id
(www.gatech.edu) shown above).  FYI, James Greene, the new CEO of Apica, also had advance confidential knowledge of TCT's proprietary inventions and patents pending (pursuant to confidentiality agreement) and appreciated its value, as he had expressed interest in possible merger with TCT in early 2005 near the same time as Dr. Yoganathan became work for hire and a consultant; so he too is fully aware of the facts cited herein.

Surgeons can then deliver therapeutic devices, such as heart valves or left ventricular assist devices, into the beating heart without loss of blood or exposure to air. Once a therapeutic device has been delivered and surgery is complete, the company's system closes and seals the access site with a biocompatible implant. The closure site can be reopened if necessary.[11]

"By minimizing the incision size to gain access to the beating heart and eliminating the need for conventional sutures, our system improves safety, decreases procedure time and reduces the technical challenges associated with these new minimally invasive procedures," explained Vinod Thourani, an associate professor of surgery and associate director of the Structural Heart Center in Emory University's Division of Cardiothoracic Surgery."… [12]

"Our goal is to accelerate and expand the adoption of less-invasive therapeutic procedures to a greater number of surgeons and as a result, many underserved patients will receive needed treatment for valve disease and end-stage heart failure," said Ajit Yoganathan, Regents professor and Wallace H. Coulter Department of Biomedical Engineering at Georgia Tech and Emory University."[13]

"Apica Cardiovascular was founded in 2009 based on technology invented by Jimenez, Thourani, Yoganathan and Thomas Vassiliades, who was an associate professor of cardiothoracic surgery at Emory University at the time. The company was named Emory University's Startup Company of 2010."[14]

"Apica Cardiovascular is a pre-revenue medical device company commercializing technology for placing valves in the heart for treating structural heart diseases….. Apica's technology has completed the proof-of-concept stage. Should the imminent clinical trials go well for its initial product application, Apica may well become an attractive acquisition target for other medical firms. The company's core technology has a range of

---

[11] Id (www.innovate.gatech.edu) shown above; Also id (www.gatech.edu) shown above).

[12] id (www.biosciencetechnology.com) shown above;  Also: Id (www.innovate.gatech.edu) shown above; Also id (www.gatech.edu) shown above).

id (www.biosciencetechnology.com) shown above;  Also: Id (www.innovate.gatech.edu) shown above; Also id (www.gatech.edu) shown above).

[13] http://gtresearchnews.gatech.edu/apica-cardiovascular/  Also: id (www.biosciencetechnology.com) shown above; Also: Id (www.innovate.gatech.edu) shown above; Also id (www.gatech.edu) shown above).  Also:  id http://shared.web.emory.edu/whsc/news/releases/2011/02/georgia-tech-and-emory-startup-apica-receives-investment.html

[14] id (www.biosciencetechnology.com) shown above;  Also: Id (www.innovate.gatech.edu) shown above; Also id (www.gatech.edu) shown above).

applications for delivering therapeutic devices to the heart and improving patient healthcare."[15]

"Designed by Drs. Thourani, Yoganthan and Jimenez with the intent of reducing bleeding of the left ventricular apex, the new device consists of a conduit that allows it to be securely attached to the beating heart."....."A series of pre-clinical studies testing the functionality of the device have been completed, with further product development and European regulatory approval being the next step."[16]

"Minimizing the incision size to gain access to the beating heart and not using sutures reduces bleeding, recovery time and heart tissue damage," says Dr. Thourani. "This device could also enable more patients to have access to procedures for valve disease and end-stage heart failure since it ratchets up the minimally invasive factor and doesn't require stopping the heart."[17]

"Initial research and development was made possible through seed funding provided by the Coulter Foundation Translational Research Program and Georgia Research Alliance "Venture Lab" Program."[18]

Apica's webite:

"Building on internationally recognized expertise, the core technologies of APICA Cardiovascular Ltd. were invented and developed at the Department of Biomedical Engineering of the Georgia Institute of Technology and Emory University. ..... The company has designed, developed and intends to commercialize a novel access and closure device (the ASC tm system) to facilitate the transapical delivery of a prosthetic valve in a patient with aortic valve stenosis. The technology is the result of long-term interactions with leading clinicians in the field. When commercially available, it will be compatible with all approved transapical valve delivery systems and will standardize the access and closure of all transapical TAVI (TA-TAVI) procedures."[19]

Listing in Business Week's description of the company's products:

"Apica Cardiovascular Ltd. manufactures cardiovascular devices. The company's product includes innovative transapical access and closure system that is

---

[15] http://www.enterprise-ireland.com/en/Start-a-Business-in-Ireland/Startups-from-Outside-Ireland/Case-Studies/Apica-Cardiovascular.html

[16] http://www.surgery.emory.edu/news-and-events/news-reports/thourani-startup-apica-2011.html

[17] Id. (www.surgery.emory.edu)

[18] This is a false statement insofar as Coulter is concerned, as I developed this technology, and is evidence of the public interest and funding of Georgia Research Alliance, with which many of the false statements herein referenced are affiliated. http://www.ott.emory.edu/Office/News/press/1-21-2001%20Apica%20investment.pdf

[19] http://www.apica.ie/

designed to simplify and standardize the technique used to open and close the apex of a beating heart."[20]

Listing by Investment Banker, Seroba Kernel Life Sciences:[21]

"An open and shut case for a lifesaving investment Apica has developed an implantable 'open and close' device enabling the safe standardized delivery of therapeutic devices into the beating heart. This will be used initially to facilitate the replacement of aortic valves and could also be used for the delivery of mitral heart valves as well as ventricular assist devices (VADs)."

"Apica originated from Seroba Kernel's interactions with Emory University and the Georgia Tech Institute of Technology (GIT)...... we worked with the founder, GIT, Emory University and Triventures to ....lead the Series A financing.  We sit on the Board and actively engage with management to help shape the company's direction."

Medical Devices Today website:[22]

"Apica Cardiovascular is leading the field of transapical access and closure for structural heart disease.  Its first product is a titanium coil that stabilizes the surgical access site in the apex of the heart to prevent bleeding during and after therapeutic interventions and provides for reaccess in the future. ..."

Global Atlanta magazine:

"Apica Cardiovascular, a partnership between the Georgia Tech Institute of Technology and Emory University, is in the process of researching and testing a device that makes the procedure less invasive and does not require stopping the heart, a Georgia Tech spokesman told Global Atlanta in a telephone interview."

"Stephen Cross, Georgia Tech executive vice president of research, said in a news release that this investment could benefit economic development in Georgia by accelerating research results in the market."

[Article names Jimenez, Thourani, Vassiliades, and Yoganathan as founders; and has picture of Greene, Thourani, Jimenez, and Yoganathan.][23]

Emory University Start Up Portfolio:[24]

---

[20] http://investing.businessweek.com/research/stocks/private/snapshot.asp?privcapId=118654464
[21] http://seroba-kernel.com/portfolio/medical-devices/apica-cardiovascular/

[22] http://www.medicaldevicestoday.com/
[23] http://www.globalatlanta.com/article/24571/

[24] http://www.ott.emory.edu/VentureLab/Start_Up/index.cfm

"Current Status:  Apica Cardiovascular is a medical device company that provides innovative "access and closure" technologies to help operate and repair patients' hearts."

"Company Profile:  Apica Cardiovascular simplifies cardiovascular surgery with its innovative closure port technology.  Typically, when a patient undergoes heart surgery, they must undergo cardiopulmonary bypass and have an invasive procedure performed for a lengthy period of time.  With Apica Cardiovascular's technology, an easy access port is incorporated into the procedure and with it, a surgeon can deliver a cardio medical device straight to the beating heart without the loss of blood.  After surgery, this port can still be accessed for future operations."

"This device not only improves the ease of surgery but greatly increases the safety of heart surgery for a patient."

Emory Health Science Blog: Article of February 8, 2011:

"Vinod Thourani, associate professor of cardiac surgery at Emory School of Medicine, along with Jorge Jimenez and Ajit Yoganathan, biomedical engineers at Georgia Tech and Emory, have been teaming up to invent new devices for making heart valve repair easier."

"At the Georgia Bio and Atlanta Clinical and Translational Science Institute's second annual conference on academic/industry partnerships, Thourani described how he and his colleagues developed technology that is now being commercialized."

"Apica Cardiovascular was founded based on technology invented by Jimenez, Thourani, Yoganathan and Thomas Vassiliades, a former Emory surgeon."

"Thourani is associate director of the Structural Heart Program at Emory."

"Yoganathan is director of the Cardiovascular Fluid Mechanics Laboratory at Georgia Tech and the Center for Innovative Cardiovascular Technologies.".....

"The technology simplifies and standardizes a technique for accessing the heart via the apex, the tip of the heart's cone pointing down and to the left. This allows a surgeon to enter the heart, deliver devices such as heart valves or left ventricular assist devices, and get out again, all without loss of blood or sutures."

"At the conference, Thourani recalled that the idea for the device came when he described a particularly difficult surgical case to Jimenez. Thourani said that a principal motivation for the device came for the need to prevent bleeding after the valve repair procedure is completed."[25]

Emory Update magazine:

"Up and Coming Emory Technology.....Start Up of the Year:   Cardiothoracic surgeon Vinod Thourani and colleagues from Georgia Tech have started Apica Cardiovascular to develop a proprietary "access and closure" device that provides access to a beating heart during surgery without loss of blood."[26]   [with picture]

Emory's OTT Annual Report for 2011 (online):

"An Emory and Georgia Tech medical device start-up development company. Apica Cardiovascular, developed a system to simplify and standardize the technique for opening and closing a beating heart during cardiac surgery.  Apica, which was founded by Vinod Thourani, MD, Ajit Yoganathan, PhD, and Georgia Tech's Jorge Jimenez, PhD, recently received a $5.1 million investment. The company is working to develop the system, which makes the procedure for delivering therapeutic devices to the heart, including aortic and mitral valves, more routine and expands the use of surgical techniques that do not require stopping the heart. The company was named Emory's Start Up Company of 2010." [With photo of Thourani].

[Even though often unstated, the bulk of the above articles included pictures of founders and/or chief officer of Apica.]

**Plagiarism by individual at Georgia Tech's Venture Labs, and Misappropriation of Technology by GTRC employees and assistants in use of testing facilities as Work for Hire, for competition for profit, and Discovery of Competition by You:**

When you were soliciting and receiving my confidential and proprietary information as consultants, you, Dr. Yoganathan and Dr. Thourani, never disclosed your intent to compete with me or my company or that you had an adverse interest for use of my confidential and proprietary information. Thourani had told me and led me to believe all along that his continued relation with Georgia Tech is that he was doing research on the "chain-type mitral ring of Dr Yoganathan and Jorge Jimenez". This non-disclosure subsumes, and is in addition to, duties under applicable

---

[25] http://www.emoryhealthsciblog.com/?tag=apica-cardiovascular http://www.emoryhealthsciblog.com/?tag=apica-cardiovascular   Although this Emory Health Science article quotes Dr. Thourani as taking credit for the invention, he is not listed on any patent related to Apica (or any patent listed herein); although the other three founders are listed on several applications, including the one for apex/aorta connection.

[26] http://whsc.emory.edu/home/publications/health-sciences/update/march_2011/march2011.html

agreements and law. Nor did Emory University or Georgia Tech or any of the alleged founders or agent of Apica contact me. Georgia Tech, and its affiliates, GTRC, or GT Innovation Institute, or Advanced Technology Development Center, and its employee, research assistant and part of research faculty, Mr. Jimenez, and Georgia Tech professor Yoganathan, never alerted me of their intention to use my confidential information, which was acquired as a part of their work for hire from me and for me, for their own personal profit. Work for hire, by itself, and work for hire, without disclosure that you were surreptitiously in earnest competition, defeat all subsequent wrongful use of that information.

Despite many years when I thought Dr. Yoganathan (and his assistant Jimenez) were loyal to my efforts, and understandably so, based upon work for hire and consultant relationships and non-disclosure agreements, I now discover they were arch competitors, with surreptitious plans and actions to arrogate my inventions (including transapical access and method of repairing mitral valve) and publish false claims. Mr. Jimenez has gone from Georgia Tech research assistant to a top officer in a new company who claims publicly invention and proprietary ownership of inventions by me and confidential information from me, and likewise, Dr. Yoganathan has gone from Georgia Tech/Emory professor and head of certain testing labs to a founder and beneficial owner of the new company that publicly and falsely claims my own invention, proprietary ownership of inventions and confidential information he had received from me.

During parts of 2005, 2006 and into early 2007, tests and research were conducted at my direction for the benefit of TCT in labs at Georgia Tech, and periodic consultations were made thereafter, at which time I introduced my junior partner Dr. Vinod Thourani to Dr. Yoganathan and associates and taught him the transapical access and chordal replacement methods I had invented and entrusted him to continue the tests and research that I had directed in the Ga. Tech labs, in close collaboration with Jorge Jimenez. I did so, due to my understanding at the time that University regulations stipulate that the inventor should not conduct the actual experimentation for fear of bias due to concerns of personal and financial interests overshadowing the purity of testing and accordingly to keep results from being biased; and second I assumed based on my understanding of the Release Agreement of 2002 that Emory and Emory Research Collaborators are allowed opportunity to participate in research, with no commercial rights.

During 2007 and 2008, Drs. Thourani and Yoganathan worked together to develop Surgical Techniques which included a saddle shaped Annuloplasty Chain. As I was led to believe, their inventions and/or research collectively included three Surgical Techniques: 1) the annuloplasty chain ring; 2) the saddle shaped ring; and 3) the "GeoControl" ring. All of these techniques, as I was informed, involved stopping and surgically opening the hearts, and installing annuloplasty rings in animals that were surgically induced in prior operations performed by Dr. Thourani according to protocols previously established by Dr. Gorman of the

University of Pennsylvania to develop chronic heart failure and secondary mitral regurgitation. They were very different from my technology, I was assured repeatedly.

They never invented and never openly worked on minimally invasive transapical access to a beating heart. That was my invention and my focus. The idea of the means of minimally invasive beating heart repairing of the mitral value was my idea, revealed to Dr. Yoganathan from the inception of his engagement as work for hire and depicted on drawing signed by Ms. Schmierer,[27] but this idea was later arrogated by Dr. Yoganathan and depicted in his 2010 slides for his company as "SeptalCincher".

The relationships between Dr. Yoganathan, Jorge Jimenez and Dr. Thourani with me were very positive, and in the early years, Dr. Yoganathan and Mr. Jimenez were always asking for more information so that they could understand every aspect of the desired assignment. After the initial tests together, every three or four months, Dr. Yoganathan would call and suggest that we need to get together and stated that he wanted to work together and on at least one occasion to raise more money; and annually or more frequently, he and/or Mr. Jimenez would call and say that wanted to meet to discuss business and that they wanted to work together and actually schedule meetings, often dinner appointments, but always one of them would cancel the dinner at the last minute. Oddly, such a call wanting to "work together" was made to me while I was overseas on January 10, 2011, which was long post -Apica founding, Interestingly enough, all their plans to establish Apica and to claim transapical access as the main platform of such company were made in 2009 or prior and in utmost secret from me by Thourani, Yoganathan and Jimenez and their backers at Emory and Georgia Tech (as I later discovered).

In early 2009, Jorge Jimenez delivered a Business Plan for "Cardiac Solutions Inc." which comprised forty five (45) pages. On its face, it said it was prepared by Jorge, but today, the metadata says it was prepared by Dr. Yoganathan of Georgia Tech in August of 2008 (and printed August 18, 2008, at 6:38:00), and modified February 8, 2009 at 7:59 pm. This Business Plan covered a very wide range of technology. It did not describe or discuss my transapcial access, but it inappropriately contained a drawing of it (p. 20), and it described the "Septalcincher" which is based upon my idea, disclosed to them in February 2005.[28] Cardiac

---

[27] See Ex. A-3, further discussed on p. 22, infra. This shows a cincher through the transapical port to reduce the A-P (anterior – posterior) distance between anterior and posterior components of the annulus of the mitral valve, and thus increase the coaptation of the two leaflets of mitral valve, and accordingly reduce mitral leak (and make an oval shaped annulus by partially squeezing the dilated circle). The "SeptalCincher" is same idea doubled, like a double stitch, and positioned parallel to make an oval (and partially squeeze circle together). My design drawing of January 5, 2006, (Back Up Ex. p. 53) elaborated on this idea with one drawing to make an oval and another doubled one (with crossed "X" cinchers) to make a large circle into smaller circle.

[28] See footnote 27.

Solutions Inc. was a "fishy" non-existent entity, having been dissolved in Georgia in 2001 (and no connection to Yoganathan or Jimenez was discovered).  On p. 5 it expressly stated that:

> "through translational research programs at Georgia Tech and Emory University, 500K dollars have been directly invested in CardiacSolutions products.  CardiacSolutions is currently raising a $5M Series A Preferred Round, which will accomplish the following major milestones:  [advances for the GeoControl device and TriValve device]."

Despite its "fishy" and somewhat encroaching nature and the fact that its own proprietary technology that was not of major interest to me, TCT reacted positively, as it did to most proposals for exploration and cooperation (without addressing details), because Dr. Yoganathan's involvement meant: a) perpetual access to Georgia Tech's labs, access to Georgia Tech's public and private monies, including those of the Coulter Foundation and the Georgia Research Alliance.  On March 23, 2009, promptly after receipt of the Business Plan, TCT's Chief Technology Officer invited Dr. Yoganathan and Mr. Jimenez of Cardiac Solutions Inc. to discuss joint venture or merger. No response was made to that offer[29]---despite many prior and even subsequent overtures, virtually perpetual, which expressly invited that kind of response.

Today, due to its content and inexplicable lack of response to our positive response, it is clear that this Business Plan was a "Trojan Horse", when presented in advance of Apica, designed to induce a negative response or any response that would advance the plan of arrogation of my technology, including creation of a split in relationships.  But obviously, my participation or consent was not required.

Now with more retrospection, the Business Plan for Cardiac Solutions Inc. appears fraudulent in several respects, including the non-existent entity and the unknown funding.  I am suspicious that the $5M Series A Preferred Round was the precursor to the Apica transaction.  I have no knowledge of the parties to whom this document was submitted in 2008, but suspect it could have been the investment bankers for Apica and possibly Emory and/or Georgia Tech.

Several features of this Business Plan match the soon to be formed and publicly described "Apica": 1) the aforesaid financing and its size; 2) from the Introduction (p.3), "the core technologies were invented and developed….at the Georgia Institute of Technology and Emory University." 3) although not featured, Dr. Thourani is involved (p. 31); 4) the drawing of the transapical access port (which will become the cornerstone of Apica.  In addition, an express statement of page 31, describing Dr. Yoganathan, infers the major theme of our experiences:

---

[29] In retrospect, as known from an email, Georgia Tech  was in midst of negotiating a license transaction for Dr. Yoganathan in mid April of 2009, which in tandem with this reference to the $5 million in funding, likely refers to a pre-Apica transaction related to Dr. Vassiliades' conduit to aorta technology.  [And certainly not related to Cardiac Solutions, Inc. which did not exist, and if so, Emory should have been involved also.  These are areas on which full disclosure is sought.

"He has actively consulted for all major cardiovascular device firms and several startups.  Almost all heart values commercially available today have been tested in some form or another in his laboratory."

A natural inference, and the proper translation of the above quote, based on the experiences recounted herein is that Dr. Yoganathan's knowledge from uses of his testing laboratory is available, which is confirmed in that document (without limitation) by his drawing of the transapical port. [30]  This Business Plan is expressly for the purpose of raising money based on a wide spectrum of technology, which likely is the cumulative cutting edge IP known to the authors.

It is ironic that none of the alleged proprietary technologies described in the Cardiac Solutions, Inc. Business Plan (pp. 33-34), are the core of Apica, but rather my technologies, which they implicitly recognized as the valuable invention, arrogated over the steps herein described until full brazen false public statements.

In May of 2010, months after having secretively from me and my TCT colleagues formed their Georgia-registered company Apica, Dr. Yoganathan and Mr. Jimenez forwarded their slide show (of seventeen (17) slides) for Cardiac Solutions.  It began with multiple pictures of their technology but ended with multiple pictures of the minimally invasive transapical access and the septalcincher.  Mr. Jimenez showed a www.cardiac-solutions.net email address, but it was not functioning, and the company had been dissolved as of February 24, 2001. [31]

On January 21, 2011, Dr. Paul Spence of Kentucky emails me the information about Apica published in the Irish Times; and later that month I hear from Dr. Russ Medford that he has just come from an Emory Conference wherein it was publicly announced that others (founders of Apica) had invented my technology and my inventions!!!  From that point on, I began to learn the additional information contained in this letter (much of it discovered this past month as sometimes noted).

**Context: Your Later Patents do not match your false statements, but reflect "Creeping" arrogation of my work, and brazen claims:**

This letter is not focused on patents of anyone subsequent to mine, nor was I, as I relied upon colleagues and consultants not to take my intellectual property or enter competition without

---

[30] Undoubtedly most, if not all, who utilize such testing labs do so with the understanding that their IP will be respected, non-disclosed and protected, consistent with the Institute's principles.

[31] The founders and representatives of Cardiac Solutions Inc. were in Penn. and Illinois; and no record was found of any tie to Dr. Yoganathan or Mr. Jimenez (and it was non-existent at time of the use).

000016

clear notice. [Suppression of a material fact is a fraud under Georgia law, for which equity grants relief.] However, for full context, all press releases and websites for Apica refer to "heart access and closure", which is my invention, none of your or your colleagues' work make reference to this. Recent investigation has revealed "creeping" claims toward my work, but well short of the published ones (i.e. the false statements in press and online), including the following for context:

> 2004 application not granted: Dr. Thomas Vassiliades applied for a patent in 2004 (which does not impact my technology) and that patent application was denied. This application was a major part of Emory's Director of the Office of Technology Transfer Dr. Todd Sherer pressure on me in December of 2005 to form ValveCo, in a forced partnership with Dr. Vassiliades, and grant Emory numerous rights. 2005 application (not yet granted to my knowledge): On October 14, 2005, Dr. Vassiliades et al, with GTRC as assignee and Emory as assignee, filed an application which refers to any tissue wall in the "Field of Invention", but the bulk of the detailed disclosure, following the "tissue wall" abstract, relates to apical aortic conduit and connection (which was invented for the purpose of draining the heart via that by-pass of the aortic valve, not intra-heart repair) . This application was also a major part of Emory's Dr Todd Sherer pressure on me in December of 2005 to form "Valve Co." in an encouraged partnership with Dr. Vassiliades. I had no knowledge of the specifics of this patent application which was not published until after these events, and was not a matter that I followed. Neither this application, nor his prior one, nor his subsequent one, makes any reference to my patents or my proprietary information (from 2001, with subsequent improvements) which related to the permanent or temporary gateway to heart through apex. The idea of a connection to the aorta (outside of the heart) was Dr. Vassiliades' invention as he explained to me during the summer of 2005, as a drain on the heart via an extra anatomic by-pass of blocked, stenotic and difficult or dangerous to access heavily diseased and calcified native aortic valve, not for access to inside the heart. Recent review of the written disclosure of alleged invention to Emory dated August 22, 2005, reveals that initial disclosure to Emory was apparently oral and was presented on July 18, 2005 to Todd Sherer and Jennifer Moore of Emory.  This patent application (filed October 14, 2005 and approximately 18 pages single spaced in length) contains approximately two sentences for the first claim of method of access to left ventricle or for intra-heart repair or replacement.[32]  In meetings subsequent to the ValveCo proposal (December of 2005), I learned that Dr. Yoganathan, as a mechanical engineer, was assisting Dr. Vassiliades, whose fields of interest were not understood to be the same as mine, but was to create an extra anatomic drain that replaces the function of a blocked aortic valve, with such device they referred to as Apico-Aortic Connector. Recent review of the patent application shows Dr. Yoganathan and Mr. Jimenez as co-inventors with Dr. Vassiliades. 2007

---

[32] See Ex. E-1.

application granted December 7, 2010:  On April 24, 2007, Dr. Vassiliades, Dr. Yoganathan, and Mr. Jimenez filed a patent application (eighteen or more pages with double extra long columns of small type), which was published October 30, 2008, granted December 7, 2010, with Emory and GTRC as assignees.   Therein approximately six (6) sentences describe how the invention (related to connection between the aorta and apex of heart) may be utilized for intra-heart access even though that was not its primary or logical purpose, and may be used to implant a conduit and/or port for left ventricular access.[33]  None of this was ever mentioned to me by any of those involved at any time and was intentionally kept secretive from me.

My use of GTRC, Dr. Yoganathan and Mr. Jimenez as work for hire and consultants all through these years of 2005 forward, including tests on the mechanical heart during summer of 2005, at which I time I requested, paid for and instructed them to modify the so called Georgia Tech mechanical heart and place an "apical port" resembling a one way valve to allow access to the left ventricle and thus to simulate and to test my invention of Transapical Access, which included full understanding of my invention.  That disclosure and my separate disclosure to Dr. Vassiliades in January of 2005 (as a part of Emory faculty), need to be understood, not only substantively, but in connection with key dates.  The October 14, 2005 patent application was filed prior to time that GTRC shared the results of my first tests (which were first shared in November), and Emory has paid someone $15,000 related to patent applications (many related to GTRC/Dr. Vassiliades were through firm of Alston & Bird), as revealed on the ValveCo proposal.  In 2009, Apica was formed.  The claims for access for repair of heart valves and closure of the entry point and as a system of access to the interior of the heart, were not a material part of the 2004 application, and both the brief references to it in the 2005 application and 2007 application, above, have the appearance of an afterthought and are completely illogical, and most importantly, *are precisely my confidentially disclosed information.*

The wrongfully arrogated technology, and claim to the technology of the transapical port, is very valuable.  And on the other hand, there is no meaningful market for intra-heart repair via an apex connection to an aorta connection since it represents an extra, unnecessary step (the creation of a connection to the aorta, in addition to an apex connection) and since it was created for a purpose completely unrelated to intra-heart repair (i.e. it is a drain, not an access for the heart).  The arrogation is for the prestige of the latest invention for the larger market for intra-heart repair.  While a false prominence or arrogation is realized (which has unknown value), the main result is complete devastation to my rights and interests and those of TCT and its investors.  The brazenness of the participants is evident from Georgia Tech's Venture Labs website which describes as Deal # 202, the "Jimenez Apical Access System":

"The apical access system with a universal connector allows a surgical implantation of left ventricular assist device on a beating heart with minimal invasivity.  This represents a

---

[33] See Ex. E-2.

new clinical paradigm in management of heart failure." [The # 1 linked faculty member is Dr. Yoganathan.][34]

This is precisely my invention and my confidential and proprietary information to this former research assistant as work for hire and aid to GIT faculty consultant. It also describes as Deal # 13, APICA Cardiovascular:

"Apica is ....developing proprietary "Access and Closure" technologies which enable the delivery of therapeutic devices, such as Transapical (TA) delivered heart valves for aortic valve replacement (AVR), mitral valve repair (MVR) or implantation of Left Ventricular Assist Devices (LVAD), into the beating heart without loss of blood via a sealed conduit."

"IP Status: Trans-apical port & LVAD Connector patent applications:...."

[The # 1 linked faculty member is Dr. Yoganathan.][35]

Again, this is precisely my invention and confidential and proprietary information shared with this institution and its faculty member as work for hire and consultant. Note that this description of Apica is focusing solely on transapical and intra-heart repair and nowhere even mentions the aorta connection (which is their invention, noted above).

**Assignment and Release by Emory:**

Consistent with its terms and my understanding at all times, Emory's assignment and release of technology to me did not retain any right of commercialization in Emory or its research collaborators. That is the very reason for the retained royalty to Emory and the very reason for the request for the release (as it abundantly clear from Emory's written intellectual property policy). Moreover, the understanding, fair implication and required inference is one of non-competition in commercialization, and it is also implied that Emory will not falsely attack its existence or significance.

As evident herein, long after and contrary to Emory's agreement to relinquish commercialization of my inventions, Emory's Office of Technology Transfer, has both attempted to sell my invention and destroy my investment and the investment of my shareholders at the same time, while aiding and abetting others in unlawful conduct, including false public announcements.

**Breach of Duties by Emory, including the Precursor to Recent False Statements:**

---

[34] Venture Lab Tracking  https://www.quickbase.com/db/bded2xt44?a=printr&rid=202&dfid=19  See Ex. G-1.
[35] Venture Lab Tracking  https://www.quickbase.com/db/bded2xt44?a=printr&rid=13&dfid=19  See Ex. G-2.

a) **Prelude:** In late 2004 and early 2005, Dr. Sherer of OTT was trying to find technical flaws in any report from me (but none existed, and none were found) as a means to repudiate existing agreements to open up a "second bite at the apple" (quote from his email of January 11, 2005). Dr. Sherer understood fully the importance of TCT's technology, and its immense economic potential, and was determined to use his power for even more power/greater interests. On behalf of Emory, he signed a Confidential Disclosure Agreement in December of 2004 with TCT in order to facilitate a full disclosure to him. These challenges created professional expense and anxiety as TCT had already invested substantial dollars in reliance on Emory's prior actions. Eventually, the OTT agreed with me and dropped the efforts, which had been groundless. This is background on the creeping aggressiveness from unfair to illegal.

b) **Precursor to Current Events:** On December 8, 2005, in a reversal of prior policies (as understood by me) and in breach of good faith, integrity and the releases and agreements executed by Emory through its Office of Technology Transfer (herein "OTT"), OTT initiated a course of conduct to pressure me to form a company with Dr. Vassiliades called "ValveCo" and grant Emory: a) increased royalties (more than doubled) and b) an equity stake (four times the size of a donation I had contemplated), and c) preferential right to initial cash, in exchange for a license from Emory (which was understood to be the same technology that I currently owned, but falsely "spun" to imply significant rights held by Emory).[36] This presentation denigrated my technology, which was an original invention and patented, and elevated Dr. Vassiliades' "improvements" to the aorta connection (which were unpatented at that time).[37] My technology preceded these other "improvements" by 4 or more years, and I and others have invested not only years of time and energy, but roughly $2.5 million dollars, including investors' monies, in creating and improving my inventions. So Dr. Sherer' demands, which were wholly out of place and inapplicable to the situation, were contrary to my vested and finalized agreements with Emory and applicable law and officious and impossible. Not only were the technologies (of mine and Vassiliades) incompatible, Emory was positioned very differently with respect to each. Emory had total or substantial control over Vassiliades', but none over mine (or TCT's). My (TCT's) intellectual property was the premium technology over which OTT had no control, but

---

[36] See Ex. D, ValveCo.

[37] Dr. Yoganathan was not disclosed as any part of this "ValveCo" proposal, current review of the date for the last patent application referenced therein shows that the co-inventors were Dr. Vassiliades, Dr. Yoganathan and Mr. Jimenez; so he was involved even if undisclosed. Moreover, available evidence indicates that the "ValveCo" proposal was made without Dr. Vassiliades' prior knowledge, who questioned the compatibility of the two technologies, businesswise, from its first presentation. And certainly, it was made without mine. However, emails a few months earlier indicate that Dr. Yoganathan introduced Dr. Vassiliades' technology to St. Jude representatives at the same time he was requested to present TCT's technology, and later emails suggest that those representatives considered TCT's technology and Dr. Vassiliades technology for joint development (without any input from me or from Dr. Vassiliades, to my knowledge). I have no knowledge of the source of the idea for the proposal, but possibly Dr. Sherer obtained it from Dr. Yoganathan.

which it devoutly coveted.[38]  In the course of this "ValveCo" presentation, Dr. Sherer disclosed that he had invested $15,000 in prosecuting the patents, which we can infer was for Dr. Vassiliades (since it was not for me). That $15,000 investment explains a prime reason for presenting the alleged invention orally to Emory a full month in advance of written disclosure to Emory----to create excitement and support (and investment of $15,000), which means Sherer had investment in one side of the ValveCo proposal.  The ValveCo proposal was precursor to a complete adverse relationship and synergistic conspiracy.  It was a contrived ploy, and included the proposal to increase the royalties to 4.5%, with control to Emory, and a 33% return (after expenses) to the founder, which (with no expenses) would have increased Emory' royalty 50% (from 2% to 3%), not counting multiple additional interests.  The false view of Emory as the holder of collective intellectual property, as opposed to fixed royalties, (as presented in the Valveco proposal) is a precursor to Emory's statements on Apica, and its role in structuring and facilitating the false public relations campaign to fund it and its arrogation of my intellectual property.  False statements by themselves, especially in coordinated public statements by prestigious academic institutions, are egregious and devastatingly damaging to intellectual property and public image, but in tandem with financial interests even more egregious, so this letter respectfully demands full disclosure of such interests.[39]

The later Apica transaction essentially includes the ValveCo proposal (including Vassiliades's technology and TCT's---featuring TCT's, which is expressly touted as its core technology based on license from Emory and Georgia Tech), without the participation of TCT and thereby destroying TCT's intellectual property in a most dishonest and illegal manner.  In the unaccepted ValveCo proposal, the OTT evidenced abuse of Emory's power, but the Apica transaction, it was an egregious form of fraud and dishonesty that is immensely damaging.

In testimony to the pure disingenuous "baloney" touted by Emory's OTT in the ValveCo proposal, the Microsoft Excel metadata with respect to the core spreadsheet of assumptions and hypothetical monies (labeled "ValveCo4 (1)") shows that it was prepared by Jessica Alderman

---

[38] Other major misunderstandings inherent in OTT's ValveCo proposal: P. 1 mistakenly shows the Aortic Valve market as largest share (60%), and mistakenly assumes that Dr. Vassiliades' technology involves the repair of that valve---it does not, it is a method of by-pass (so a small fraction of that market); and on next page (term sheet), first paragraph of "Licensed Technology", labels his technology as the "Minimally Invasive Apiciarotic System," while calling mine Mitral Valve Repair System (when in fact mine is the patented minimally invasive system and the only one for intra-heart repair); and on the last page assumes "no split with Ga Tech" who doubtless claims an undisclosed share of Dr. Vassiliades' technology.  So there was a complete lack of understanding of facts and medicine (in addition to rights).

[39] Query, what extra interests, if any, (above the traditional 2% royalty) did Emory realize, in tandem with its campaign of false public statements, for its wrongful recognition (i.e. actually, sale and disparagement) of my inventions as those of the founders of Apica?  Query, in the interest of full knowledge of the finances, does Emory pay bonuses to its OTT representative for revenue and/or interests generated from alleged licenses and/or transactions?

Zeaske of Oregon Health & Science University on March 5, 2003 at 3:54:58 pm. That is roughly three (3) years prior to this meeting and thus could have had no reference to it.[40]

My contemporaneous assessment of this initial ValveCo meeting was relayed to other members of TCT as follows:

> ...Emory is interested in "having a piece of the action" of the technology I invented and since has been licensed to TCT. From the jest of the discussion, it is clear that Emory regrets letting go with my inventions and wishes to find a way to get in somehow again. The proposal as expressed in the meeting and attached documents was rejected by me immediately for the obvious reason that it is controlled by TCT, which in turn has made its own business plan of moving forward. Dr. Vassiliades is way behind me in IP protection, corporate development and is still entangled with Emory and Georgia Tech on who owns what portion of IP. It is very likely that he will not be able to move forward alone. I think he has to dance with Emory. I seriously doubt Emory will release his IP. ......

> ....I strongly believe that there is great value in working through a defined business agreement with Emory, perhaps by negotiating an arrangement where TCT will be the corporate arm to do what they are proposing ValveCo does in the enclosed documents. I have raised that possibility. They did not say no.

> If this is of interest to TCT, then TCT and Emory need to get into direct negotiations, I should be excluded from those discussions for the obvious reasons of dual responsibility and conflict of interest.

Now, after the fact, I am not certain who contacted whom first for the false public relations campaign related to Apica, Emory and Georgia Tech, or who thought up the false spin of the claim of invention and main focus of heart open and closure, but the statements are false and coordinated and intentional, and I have not seen the alleged license(s), but the above activities breach duties to me in multiple ways (and to public in terms of just false statements), including: denigration of my invention, piracy of my confidential and propriety information, and aiding and abetting multiple breaches of duties (including my contract of assignment and release, and torts), infringement of on my right to publicity for my own invention, and on and on. Mendacity is evident from the OTT's initial recognition of my technology (including pro-formas of $300,000,000 in sales,) to evolution into completely pirating and ignoring it. In June of 2012, Todd Sherer of the OTT did not remember or have any recollection of my prior intellectual property, patent applications or patents![41] As a long-term admirer of Emory's commitment to

---

[40] A purely speculative hypothetical borrowed from an unknown/undisclosed source regarding an unknown transaction is undeserving of trust or the extent of effort into its "pitch"; and inappropriate and abusive.

[41] Such encounters, (after prolific interchanges, formal confidential disclosures, acknowledgement of immense value of my patents (in ValveCo), offer of AMVP for 50% increase in royalty in November of 2010, takeover of

integrity, ethics and fairness, this has been shocking to experience.[42] The result is total support for the later improvement of Dr. Vassiliades, et al (which is not a direct entrance to intra heart surgery, or as falsely promoted as inclusive of my inventions), and thus constitute massive efforts to destroy my inventions and investments and those of investors in TCT.

**Background on Other Fraud and Deceit by faculty and staff at Georgia Tech which Support Willful Intention to Not Respect the Intellectual Property of Guests and Purposefully Avoid Written Affirmation of the Oral Assurances from staff at Georgia Tech (including joint Emory/GT representative).**

These events occurred in the context of other facts which suggest deliberate fraud by Georgia Tech staff, and intent to refuse to sign the demanded Non-Disclosure Agreement with discovery of what appears to be fraudulent forms from GTRC, and the suppression of same for years, which is complementary to the main story of intent to plagiarize the intellectual property of others. In fact, these forms are super deceptive and only serve as a platform to defraud and defend fraud.

Ann Schmierer, corporate liaison at Georgia Tech, and Lee Herron of the Innovation Institute and Advanced Technology Development Center also knew of the confidential need for the testing services and facilities, and you, Dr. Yoganathan, Ann Schmierer and Lee Herron each affirmed the standing and unequivocal policy of Georgia Tech to respect my IP and that of TCT, which was routine for inventors who arrange to utilize your testing labs and services. This sensitive concern on my part was affirmed always, and your only disclosed invention remotely related to my area was the Annuloplasty Chain, which was not a concern and not competition for my focus. Ms. Schmierer solemnly acknowledged the confidential disclosure on February 24, 2005, by signing a drawing along with David Field and myself. See signed drawing at Ex. A-3, and Affidavit of Field at Ex. H. You, Dr. Yoganathan, were present, and also invited to sign, but you said that you left all such matters to other corporate types (such as Ms. Schmierer). Of course, you, Dr. Yoganathan and your assistant, Mr. Jimenez, well knew of its proprietary nature, and as one example of many acts of reassurance, you assisted TCT in obtaining Non-Disclosure Agreements from personnel from St. Jude Medical for the benefit of TCT in advance of sharing TCT's PowerPoint presentation on behalf of TCT.

I and TCT's representatives were extremely interested in receipt of a protective non-disclosure agreement from the inception and over a long period of time, but all contact with you was positive and reassuring that our intellectual property was safe. Despite requests, no non-

---

patent applications for my new inventions in 2009, etc) are beyond comprehension and inescapably present very bad and dishonest images.

[42] The OTT, when formerly represented by Frank Stout, did not evince false statements and unlawful conduct. Mr. Sherer has described his work as "being aggressive about pursuing the best deal possible for Emory" in prior emails (January 11, 2005), for which he expressly made no apologies, but in my experiences he has failed to recognize the difference between lawful conduct and the current prima facie indicia (cited herein) of piracy, false statements, fraud and oppression.

disclosure agreement was ever presented timely or forthrightly to myself, David Field (who had
left TCT soon after the 2/24/05 meeting) or to Amin Rahme, Mr. Field's successor or to anyone.
Two forms from GTRC , identical in substance, prepared by GTRC in early 2005, appeared on
my computer much later, the earliest date possible believed to be November 30, 2008 ( per
metadata, the "created" date on my computer). See Ex F-1, F-2, and Affidavit of Field at Ex. H.
These forms did not register as present upon receipt and are believed to have accompanied a
revised report (on November 30, 2008) on the lab experiments of 2005 in a "zipped"
compression file, which when unzipped may produce multiple word documents, with
unanticipated ones not registering until much later (found by me on October 31, 2010). The
metadata on these forms and reports of lab experiments precisely match (and demonstrate) this
(which may have involved two or possibly three of such files). A test report ("Atlanta Chord") is
"created" on my computer on Nov. 30, 2008, at 10:49:59 am and one minute and fifty one
seconds later five (5) additional documents (including these two forms in question) are created at
the same minute and same second (10:51:50 am), and two additional forms one second later.
These forms did not register as deceptive until a date in October of 2012 (this past month), and
when discovered (October 31, 2010) did not register as having any significance other than: a)
they appeared on their face (at first blush, falsely) to be a normal protective non-disclosure
agreement and to reflect GT's duty and effort to respect my intellectual property; and b) by
appearing years after the request, they induced an assumption (prior to recheck of records
recently) that it may (possibly) have been signed by an unknown representative, that it reflected
evidence of GT's prior good faith, and that they may have been lost in proper channels at GT or
in route to TCT. Recent review of records and communications with all relevant TCT personnel
confirms that these agreements were never received (except belatedly, mysteriously at apparent
time of other test data, as noted) and never reviewed or considered. The immediate impression
from scanning the document, with its definitions of trade secrets and confidential information
and disclosure of Dr. Yoganathan's Annuloplasty Chain invention, is that it is responsive to the
request for protection of the guest's (TCT's and my) intellectual property. However, close
inspection reveals that it is a platform for fraud that protects absolutely nothing, not one thing, of
the guest's intellectual property. Nothing from an inventor utilizing these testing labs would be
protected via this form, and it fact it would authorize GTRC to publicize the results. *In fact, any
inventor utilizing GIT's facilities who relied upon this form for protection would be deceived and
defrauded.*

Thus there was a very good reason that such forms were not, and could not, be presented
timely or forthrightly, because anyone reviewing them would recognize the deception. However,
if both the blank form and the form completed with David Field's name were presented as part of
old records later, deception and false assumptions would ensue.

The metadata on these Microsoft Word forms indicate that the blank one was created by
Heather Gorman of GTRC on Feb. 12, 2005, and the one filled in was modified on March 22,

2005, and that both were modified near 11 pm at night on February 12, 2007, and "created" on my computer (meaning the arrival date) on November 30, 2008 (at 10:51:50 in morning). As recounted above, the perfidy at Georgia Tech and the "leaky" venture lab confirm these events and non-events were not accidental.

**Trusted Advisors Prior to Betrayals Discovered in Apica:**

Dr. Yoganathan and his helper, Jorge Jimenez, were trusted advisors and consultants for years. They were supportive and solicitous of helping in any way possible, both in person and in phone calls. As examples, which are just isolated notes among continual efforts for TCT: 1) TCT's records for advisory board meeting for 11/14/2006 confirm that all three TCT designs for named devices were reviewed with them at Georgia Tech; and the update on a device in development noted that an end plate was being made to fit a GT fixture (and this agenda reflects the fact that I utilized additionally other contract engineers and labs); 2) in late 2007 I emailed Dr. Yoganathan to express my need to employ as additional help an in-house contract engineer and asked for his recommendations; 3) on November 7, 2007, Dr. Yoganathan emailed and called to warn against hiring a certain applicant as CEO for TCT;  4) on January 7, 2008, Dr. Yoganathan affirmed his willingness to serve on my Scientific Advisory Board (which was in response to form letter, as he had already been on that Board since 2005); 5) on January 13, 2008, he emailed that he wanted to meet with myself, Jorge and Dr. Thourani to discuss business matters, (and implicit from email of January 17, 2008, Lee Herron of Georgia Tech's Innovation Institute had been invited to be part of a meeting), but to my recollection the requested meeting did not occur. It underscores however that Dr. Thourani, who was my and TCT's representative in many of the tests at Georgia Tech, was working with Dr. Yoganathan and Mr. Jimenez;  6) in early January of 2009, Dr. Yoganathan and Mr. Jimenez scheduled another dinner to meet with me, but it was cancelled at last minute by Mr. Jimenez, and to my recollection, it never occurred; and 7) on October 8, 2010, I advised Dr. Yoganathan and three other Advisory Board Members of intense interest in transapical access and mitral/chordal repair by venture capitalists and to stay alert for contact and to keep identities of prospects blinded from each other, as I was negotiating with prospects separately, and that I appreciated their help (but unbeknownst to me Dr. Yoganathan, Mr. Jimenez and Dr. Thourani had teamed together as founders of Apica in 2009 premised on my technology); but no information was forthcoming.

Dr. Thourani was likewise a trusted colleague and consultant. For one example, in June of 2008, Dr. Thourani attended the Advisory Board Meeting of TCT, which included multiple prestigious surgeons and cardiologists, including Dr. Guyton, Dr. Puskas, Dr. Allen, Dr. King, and Dr. Cox among others, and the page of notes from the meeting, taken by David Smith, Chief Technology Officer for TCT, (which notes were distributed to seven principal officers of TCT with request for any corrections) contains the following from Dr. Thourani:

He [Dr. Thourani] likes the Transaortic port, but says it will be easier to do valves transapically. He could use the device with a general thoroscopic indication. It will be difficult to get the TA port large enough in the aorta to deliver a valve.

Dr. Thourani did not invent anything.

**Full Factual Details are Unknown:**

I discovered that Apica has been named by Emory University Office of Technology Transfer as Start Up Company of the Year for 2010. Preliminary investigation, and the above recited facts lead me to suspect and conclude that this company has interest in developing and commercializing the same inventions, and confidential and proprietary information that I shared in confidence with you; including reports of it conducting clinical trials in Europe (which arguably would be for the purpose of avoiding US patent laws, but should not avoid US and Georgia laws for use of confidential and proprietary (including all related to plagiarism, piracy, conversion, fraud, conspiracy, infringement of my right to publicity of my own intellectual property, misappropriation of business opportunity, etc., or filings in Europe). Apica also apparently formed a company in Ireland of the substantially similar name, but I have no other knowledge of its relationship.

**Demand for Full Preservation of Evidence and Request for Discovery:**

I respectfully request that all communications and all evidence relevant to this matter be preserved, including communications to attorneys, investment advisors, prospective or actual investors, and accountants. I request full information on the new company and any and all of its products that are substantially related to my patents and confidential information and secrets; and the identity of all persons and companies anywhere in the world where such confidential information and secrets have been disseminated or discussed and a copy of all communication to them. Should you have any documents or communications, legal or otherwise, that describe me or my company, expressly or by factual reference, or the defenses to use of my confidential information and secrets, please forward that. I respectfully request full disclosure of all investments (and/or payment of patent expenses) by any of you related to this subject matter, and all interests, and any changes in interest, of you and your colleagues in related patents and/or Apica; and copies of any and all licenses granted by Emory or GTRC, and any changes therein, related to these patents or this subject matter.

**Demand for Relief:**

I request that you:

a)  Cease and desist, and so inform me of that cessation, and fully account.

000026

b) Disclose fully, account fully, investigate and trace the chain of subsequent disclosures and uses which include or are based on my confidential and/or proprietary information, and arrange agreements to void and hold confidential and not use the information.

c) Take corrective and remedial action to reverse any and all breaches of duty and disclosure, including the integrity and the utmost good faith required in these circumstances, and reverse any and all antagonistic rights and interests conferred and received relative to my interests and/or confidential and proprietary information; and propose and share your plan to mitigate and redress the devastating damage to me, my patents and propriety information and to TCT and the investments therein.

d) All cheating redressed fully and corrected, and public apology and full damages paid.

These facts reflect manifold breaches of law and integrity, including without limitation plagiarism, conspiracy, misappropriation, false statements, false advertising, fraud infringement of my right to publicity for my inventions and proprietary information, unfair competition, beach of express or implied covenants of contract of assignment and release, unjust enrichment and breach of ethics, morality and equity, including dishonesty and unethical behavior by official agents, representatives and senior staff and faculty of academic institutions, and recipients of governmental funding for tests and programs, and perfidious misuse of testing facilities for the public good. All of the above is without limitation to such actual and punitive damages as may be applicable under Georgia law for any breach of legal duties; or to equitable relief.

In conclusion, permit me to put elements of egregiousness and conspiracy in perspective, each of the founders of Apica knew of my proprietary technology, they developed a company, Apica, and kept it a secret from me, all based on ideas I was the first to document and share with each and every one of them, including most as consultants; all materially aided and abetted by false statements and dishonest behavior by academic institutions which completely disparaged my work and investments and those of investors. Georgia Tech Research Corporation through its representatives, have besmirched it commitment to respect the intellectual property of others in its testing facilities and its work for hire. Emory Office of Technology Transfer, through the actions of its Director, Dr. Todd Sherer, has transformed from a beneficent supporter and nurturer of inventors and innovation to an aggressive dealster, building charades and pressing Emory employee/inventors to relinquish vested rights and yield to the fanciful structures, contrived by the OTT in its contacts with investment bankers, and promoted orally and in writing (which has included breach of contracts, departure from truth and reality in terms of assumed ownership of technology in advance and false statements and manifest inequitable exactions for the unjust enrichment of Emory, and yet undiscovered interests and purposes that have destroyed my inventions and investments and those of others). All, Georgia Tech Research Corporation, Emory Office of Technology Transfer and you, are implicated by the coordinated false statements, which effectuated, aided and abetted, transactions and transfers yet unknown, but completely devastating to me and TCT and investors therein.

Organized cheating in public institutions and their leading representatives is a big story that plaintiffs' lawyers of national stature can ably redress, but I and the sophisticated investors of TCT are not averse to exploration of private settlement, which will require an agreement for tolling of statutes of limitations from today as a sign of good faith for say, ninety (90) days (but recognize that this letter addresses so many violations that many are not affected and at least one federal one has none), if there is mutual interest.   One of my prime interests is to insure that all cheating is redressed fully (which logically should be a common interest), and corrected publicly and full damages paid.  As was the case when the OTT pressured TCT in 2005/2006, whenever pressure is threatened or felt by me as an Emory employee, that must be reported to the TCT's shareholders, and my understanding is that will demonstrate conclusively your lack of interest in fair and equitable private resolution.

Yours very truly,

Omar M. Lattouf, MD PHD.